RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0166P (6th Cir.)
File Name: 02a0166p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

A.D. TRANSPORT EXPRESS,
INC.,

        *Petitioner,*

    *v.*

UNITED STATES OF AMERICA;
FEDERAL MOTOR CARRIER
SAFETY ADMINISTRATION,

        *Respondents.*

No. 00-3891

On Petition for Review of a Final Order of the United
States Department of Transportation,
Federal Motor Carrier Safety Administration.
No. 00-05-296052.

Submitted: November 27, 2001

Decided and Filed: January 24, 2002[*]

———————

[*] This decision was originally issued as an "unpublished decision" filed on January 24, 2002. On May 1, 2002, the court designated the opinion as one recommended for full-text publication.

1

Before:  GUY and BOGGS, Circuit Judges; CARR, District
                      Judge.[**]

_____

**COUNSEL**

_____

**ON BRIEF:**  David E. Jerome, JEROME & AUSTIN,
Northville, Michigan, for Petitioner.  Edward R. Cohen,
Robert S. Greenspan, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., Joseph Solomey, OFFICE OF
THE CHIEF COUNSEL, FEDERAL HIGHWAY
ADMINISTRATION, Washington, D.C., for Respondents.

_____

**OPINION**

_____

JAMES G. CARR, District Judge.  A.D. Transport Express,
Inc. petitions for review of a Final Order of the Federal Motor
Carrier Safety Administration (FMCSA) denying A.D.
Transport's motion for a change of its "conditional" safety
rating.  The agency issued that rating after it found that A.D.
Transport was in violation of § 395.8(k)(1) of the Federal
Motor Carrier Safety Regulations.  49 C.F.R. § 395.8(k)(1).

A.D. Transport argues that the FMCSA's interpretation of
§ 395.8(k)(1) is inconsistent with the clear and unambiguous
language of the regulation.  A.D. Transport also argues that
the FMCSA's ruling was not merely an interpretation of the
regulation, but involved rule making that required notice and
a comment period.

We find the FMCSA's interpretation is consistent with the
language of the regulations.  Furthermore, the FMCSA's

_____

[**]The Honorable James G. Carr, United States District Judge for the
Northern District of Ohio, sitting by designation.

more general terms of the Motor Carrier Safety Regulations already provide. In other words, the FMCSA did nothing more than interpret an existing regulation. Accordingly, we hold that the Final Order of the FMCSA was an interpretative rule exempt from the notice and comment requirements of the Administrative Procedure Act.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the Final Order of the FMCSA.

interpretation does not impermissibly expand the regulations, so that no notice or comment period is necessary. Accordingly, we affirm the FMCSA's Order in all respects.

## BACKGROUND

In late 1999, Congress enacted the Motor Carrier Safety Improvement Act of 1999, Pub. L. No. 106-159, 113 Stat. 1748 (1999). The purposes of the Act are:

> (1) to improve the administration of the Federal motor carrier safety program and to establish a Federal Motor Carrier Safety Administration in the Department of Transportation; and

> (2) to reduce the number and severity of large-truck involved crashes through more commercial motor vehicle and operator inspections and motor carrier compliance reviews, stronger enforcement measures against violators, expedited completion of rulemaking proceedings, scientifically sound research, and effective commercial driver's license testing, recordkeeping and sanctions.

*Id.* at § 4.

On establishing the FMCSA as an administration of the Department of Transportation, Congress identified:

> SAFETY AS HIGHEST PRIORITY.--In carrying out its duties, the [FMCSA] shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in motor carrier transportation.

*Id.* at § 101 (codified at 49 U.S.C. § 113).

Among its responsibilities, the FMCSA must maintain, by regulation, a procedure for determining the safety fitness of

commercial motor carriers. *See* 49 C.F.R. § 1.73 (delegating to the Administrator of the FMCSA the function and authority vested in the Secretary of the Department of Transportation by 49 U.S.C., Subtitle IV, part B). Accordingly, the FMCSA has established procedures to determine the safety fitness of motor carriers in 49 C.F.R. Part 385.

Pursuant to Part 385, motor carriers are assigned either a "satisfactory," "conditional," or "unsatisfactory" safety rating. 49 C.F.R. § 385.3.[1] The safety rating is based on the degree of compliance with the safety fitness standard for motor carriers. 49 C.F.R. § 385.5. To meet the safety fitness standard, a motor carrier must demonstrate that it has

---

[1]The Federal Regulations define the safety ratings as:

(1) *Satisfactory safety rating* means that a motor carrier has in place and functioning adequate safety management controls to meet the safety fitness standard prescribed in § 385.5. Safety management controls are adequate if they are appropriate for the size and type of operation of the particular motor carrier.

(2) *Conditional safety rating* means a motor carrier does not have adequate safety management controls in place to ensure compliance with the safety fitness standard that could result in occurrences listed in § 385.5 (a) through (k).

(3) *Unsatisfactory safety rating* means a motor carrier does not have adequate safety management controls in place to ensure compliance with the safety fitness standard which has resulted in occurrences listed in § 385.5 (a) through (k).

(4) *Unrated carrier* means that a safety rating has not been assigned to the motor carrier by the FMCSA.

49 C.F.R. § 385.3.

requiring notice and a comment period under the Administrative Procedure Act, 5 U.S.C. § 553(b). According to A.D. Transport, the ruling of the FMCSA is void because the FMCSA did not provide the required notice and comment period. *See D.W. Food Ctrs., Inc. v. Block*, 782 F.2d 751, 757 (6th Cir. 1986) ("[A] rule required to be published which is not published is void, and may not be enforced against a non-complying party.").

The Administrative Procedure Act, 5 U.S.C. § 553(b), provides:

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. . . .
> . . . . Except when notice or hearing is required by statute, this subsection does not apply—
>
> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice . . . .

Thus, interpretative rules fall within an exception to the Act and do not require notice and comment.

An interpretative rule is a rule that clarifies or explains an existing law or regulation. *Your Home Visiting Nurse Servs., Inc. v. Sec. of Health & Human Servs.*, 132 F.3d 1135, 1139 (6th Cir. 1997). A rule is interpretative if it "merely explains 'what the more general terms of the Act and regulations already provide.'" *Id.* (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983)).

Here, the FMCSA's Final Order did not change any existing law or policy. Furthermore, the FMCSA's interpretation does not depart from the literal language of the regulation. Rather, the FMCSA merely explained what the

receipts does not render the FMCSA's construction of the regulations unreasonable or inconsistent. *See Fluor Constructors, Inc.*, 861 F.2d at 940. The FMCSA's construction "need not be the *only* reasonable one before we will sustain it." *Id.* (citing *Marshall v. Whirlpool Corp.*, 593 F.2d 715, 721 (6th Cir. 1979), *aff'd*, 445 U.S. 1 (1980)) (emphasis in original). "Even if inartful drafting of the regulations lends itself to more than one possible construction, we nevertheless 'find that a common sense consideration of the regulations with a view toward safety compensates for cloudy regulations.'" *Id.* (quoting *Texas Eastern Prods. Pipeline Co. v. Occupational Safety & Health Review Comm'n*, 827 F.2d 46, 50 (7th Cir. 1987)). Accordingly, we defer to the FMCSA's interpretation.

Additionally, the FMCSA's interpretation better serves the purposes of the Motor Carrier Safety Improvement Act of 1999. The FMCSA's reading of 49 C.F.R. § 396.8(k) facilitates review and verification of a driver's RODS. Verification, in turn, helps assure that drivers are not on the roads for too long.

A.D. Transport's reading of the regulations would hinder the effectiveness of compliance reviews. While the plain meaning of 49 C.F.R. § 395.8(k) should not be strained to alleviate a safety hazard, we refuse to set aside a reasonable interpretation by the FMCSA which effectuates the Act's purpose of improving the Federal motor carrier safety program and promoting safer operation of commercial motor vehicles. *Fluor Constructors, Inc.*, 861 F.2d at 941 (citing *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980) ("safety legislation is to be liberally construed to effectuate the congressional purpose"); *Quality Stamping Prods. v. Occupational Safety & Health Review Comm'n*, 709 F.2d 1093, 1096 (6th Cir. 1983)).

A.D. Transport also argues that the FMCSA's interpretation of 49 C.F.R. § 395.8(k) "goes beyond the scope of the regulation," and, therefore, constitutes legislative rule making

"adequate safety management controls in place" that ensure compliance with "applicable safety requirements."[2] *Id.*

The factors considered in determining safety fitness and assigning a safety rating include information from safety reviews, compliance reviews, and any other data. 49 C.F.R. § 385.7. A compliance review is "an on-site examination of motor carrier operations . . . to determine whether a motor carrier meets the safety fitness standard." 49 C.F.R. § 385.3.

Following a compliance review, a safety rating is assigned "using the factors prescribed in § 385.7 as computed under the Safety Fitness Rating Methodology set forth in appendix B" of Part 385.[3] 49 C.F.R. § 385.9. Once a "conditional" or "unsatisfactory" safety rating is assigned, a motor carrier may correct its deficiencies and request a rating change at any

---

[2]Section 385.5 provides:

To meet the safety fitness standard, the motor carrier shall demonstrate that it has adequate safety management controls in place, which function effectively to ensure acceptable compliance with applicable safety requirements to reduce the risk associated with:

(a) Commercial driver's license standard violations (part 383), (b) Inadequate levels of financial responsibility (part 387), (c) The use of unqualified drivers (part 391), (d) Improper use and driving of motor vehicles (part 392), (e) Unsafe vehicles operating on the highways (part 393), (f) Failure to maintain accident registers and copies of accident reports (part 390), (g) The use of fatigued drivers (part 395), (h) Inadequate inspection, repair, and maintenance of vehicles (part 396), (i) Transportation of hazardous materials, driving and parking rule violations (part 397), (j) Violation of hazardous materials regulations (Parts 170 through 177), and (k) Motor vehicle accidents and hazardous materials incidents.

[3]If a "conditional" or "unsatisfactory" safety rating is issued, such a rating is "provisional," and will not become final until sixty days (forty-five days for carriers transporting hazardous materials) after receipt of written notice of the rating by the carrier. 49 C.F.R. § 385.11.

time. 49 C.F.R § 385.17. Additionally, if the motor carrier believes there has been an error, the carrier may request that the FMCSA conduct an administrative review. 49 C.F.R. § 385.15.

A March, 1999, compliance review at A.D. Transport resulted in a "conditional" safety rating. The investigator's report cited shortcomings with regard to A.D. Transport's method for keeping driver-related records. Section 395.8(k) states, "Retention of driver's record of duty status. (1) Each motor carrier shall maintain records of duty status and all supporting documents for each driver it employs for a period of six months from the date of receipt." 49 C.F.R. § 395.8(k).[4] The report following the March, 1999, review noted:

> Motor Carrier sanitizes toll receipts for company drivers by maintaining them in large boxes. Additionally, company has no means to produce toll receipts for owner operators.

(App. at 18).[5]

---

[4] The Regulatory Guidance for the Federal Motor Carrier Safety Regulations defines "supporting documents" as:

> Supporting documents are the records of the motor carrier which are maintained in the ordinary course of business and used by the motor carrier to verify the information recorded on the driver's record of duty status. Examples are: Bills of lading, carrier pros, freight bills, . . . toll receipts . . . .

62 Fed. Reg. 16370, 16425 (April 4, 1997).

[5] The investigator's report also noted:

> The motor carrier maintained all toll receipts in large boxes. It is the opinion of this investigator that this was done to preclude log verifications. Closer inspection revealed that some drivers wrote their names and/or truck numbers on their toll receipts. Therefore, this investigator went through the boxes of the tolls

together in large envelopes is equivalent to maintaining and preserving support documents in the ordinary course of business.

The FMCSA disagreed, finding that the language of the regulations requires the maintenance of an individual driver's RODS (record of duty status) along with the driver's supporting documents. Thus, A.D. Transport's practice of placing all drivers' toll receipts into a single large envelope for each month and thereby separating the toll receipts from the RODS did not comply with the regulations. The FMCSA noted that "it is reasonable to expect motor carriers to retain all supporting documents along with individual driver's RODS." (App. at 9).

We hold that the FMCSA's interpretation of 49 C.F.R. § 395.8(k) is reasonable and consistent with the language of the regulations. As the FMCSA has noted, "Common sense tells us that toll receipts that cannot be identified as having been secured by any particular driver are utterly useless in showing the validity vel non of any particular driver's record of duty status." (Final Br. for Resp't at 23). Here, A.D. Transport's practice rendered the toll receipts nearly useless in verifying a driver's RODS.[8]

There is no doubt that A.D. Transport has made a plausible semantic argument. Yet, simply because a plausible argument can be made that A.D. Transport "maintained" the toll

---

[8] A.D. Transport argues that the toll receipts were not useless and could have been used to verify an individual driver's RODS. A.D. Transport contends that the investigator could have sorted through the receipts, arranged them in order of date and time, and then compared receipts to the various driver logs. In light of the hundreds of toll receipts collected each month, such a task would be an arduous one at best. Moreover, all this task would reveal is that a particular truck passed through a certain toll at a certain date and time. Assuming the toll receipt failed to identify driver or truck (as most receipts fail to do), the investigator would still be left with the question of whether that truck was driven by the driver whose logbook is under review.

(App. at 9). A.D. Transport appeals from this order pursuant to 28 U.S.C. § 2344.

### DISCUSSION

An administrative agency's interpretation of its own regulations is entitled to substantial deference. *Udall v. Tallman,* 380 U.S. 1, 16 (1965). We defer to an administrative agency's interpretation of its own rule or regulation unless it is plainly erroneous or inconsistent with the regulation. *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *Arctic Express, Inc. v. United States Dep't of Transp.*, 194 F.3d 767, 771 (6th Cir. 1999). When an agency promulgates regulations it is, however, bound by those regulations. It may not attempt to subvert the rule-making process through interpretations that find no support in the regulation's language. *Ohio Cast Products, Inc. v. Occupational Safety & Health Comm'n*, 246 F.3d 791, 794 (6th Cir. 2001); *Fluor Constructors, Inc. v. OSHRC*, 861 F.2d 936, 939–40 (6th Cir. 1988).

A.D. Transport argues that the FMCSA's interpretation of 49 C.F.R. § 395.8(k) is inconsistent with the clear language of the regulations, and, therefore, we should not defer to the FMCSA's ruling. A.D. Transport contends that the manner by which it kept toll receipts satisfied the plain meaning of the regulations and interpretive guidelines.[7] A.D. Transport asserts that its practice of keeping all drivers' toll receipts

---

[7]In support of its argument, A.D. Transport cites language in the regulation requiring motor carrier operations to "maintain" supporting documents. 49 C.F.R. § 395.8(k)(1). A.D. Transport also cites language in the regulations discussing the "fail[ure] to preserve drivers records." 49 C.F.R. Part 385 Appendix B. Finally, A.D. Transport cites language in the regulatory guidelines defining supporting documents as "the records of the motor carrier which are maintained in the ordinary course of business." 62 Fed. Reg. 16370, 16425 (Apr. 4, 1997). A.D. Transport argues that the manner it keeps toll records satisfies the plain meaning of this language—to maintain and preserve toll records in the ordinary course of business.

The report required that A.D. Transport:

> Require all drivers to submit toll receipts so that records of duty status can be verified for accuracy. The motor carrier must establish a system to produce toll receipts for all owner operators within a reasonable amount of time (2 days). Do not sanitize toll receipts by maintaining them in a manner which would preclude log verification.

(App. at 19).

In response to the report and "conditional" rating, A.D. Transport certified to the FMCSA that it would comply with the Federal Motor Safety Regulations and follow a newly devised Safety Management Plan.

In January, 2000, The FMCSA conducted a second compliance review at A.D. Transport. At the time of the second review, A.D. Transport had 183 drivers. (App. at 53). The investigator reported that, after completing a tour of the facility:

> a list of 25 drivers was provided to Acting Safety Director . . . . This was a request that the motor carrier produce driver's record of duty status for a specific month . . . along with the corresponding fuel Tax Trip Reports. When the motor carrier produced these documents, it was discovered that the toll receipts were not in the Fuel Tax report envelopes. The motor carrier produced the toll receipts for the months of October,

---

> and retrieved all trackable toll receipts. Nine current drivers could only be selected for review because of the way the motor carrier maintained their toll receipts.

(App. at 22). The investigator, however, recommended that no enforcement action for "failing to maintain support documents" be taken "because the motor carrier had never been previously cited." *Id.*

November and December of 1999. However, they were maintained in large white envelopes. The contents of those envelopes were examined and it was discovered that they contained hundreds of toll receipts, very few of which could be identified by truck or driver. Because these toll receipts were maintained in a manner, which would preclude standard logbook verifications, the motor carrier was cited for failing to maintain them as a supporting document.

(App. at 58).

A.D. Transport made other supporting documents available, but these documents did not enable the investigator to easily verify information in the drivers' logbooks. Additionally, the inspector could not rely on A.D. Transport's computer because its program had crashed with a loss of all its data. The investigator noted, "In conclusion this investigator was left with no reliable supporting documentation, which could be used to verify records of duty status for accuracy." *Id.*

As a result of the January, 2000, compliance review, the investigator cited A.D. Transport for a violation of § 395.8(k)(1), describing the violation as "[f]ailing to preserve driver's record of status supporting documents for six months." (App. at 54). This violation led to the "conditional" safety rating being challenged in this case.

On February 17, 2000, A.D. Transport filed a Petition for Administrative Review, seeking review of the "conditional" rating. (App. at 81). A.D. Transport sought an upgrade of its safety rating, arguing that the "Compliance Review was not based on the correct interpretation of the regulations . . . ." (App. at 85).

On May 22, 2000, the FMCSA issued a Final Order affirming the "conditional" rating and denying A.D.

Transport's request for an upgrade in safety ratings.[6] In its Order, the FMCSA ruled:

It is reasonable to believe that supporting documents must be maintained by the carrier in a manner that will allow an agency investigator to compare those documents to the RODS [record of driver status]. The supporting documents regulation contains a reasonableness standard. It states that a motor carrier shall maintain records of duty status and all supporting documents for each driver it employs for a period of six months from the date of receipt. The heading to 49 C.F.R. § 395.8(k) provides assistance in answering the question because it indicates that the retention of the required documents is for each driver employed by the carrier. Petitioner's practice of placing all toll receipts into one large envelope per month does not comply with the regulation because the rule requires each RODS to be maintained along with each driver's supporting document. Here, Petitioner attempts to maintain all supporting toll receipts with every other driver's similar records. This "salad shooter" approach does not comply with the spirit of the law and frustrates proper enforcement.

---

[6]On June 13, 2000, A.D. Transport filed a Petition for Change of Safety Rating Based on Corrective Actions with the FMCSA. The petition stated that:

Now, since June 12, 2000, the driver's packets have been kept in tact [sic]. Once received, the driver's packets are transferred to each of the various departments who review the driver's packets, take the information needed, and copies for themselves [sic] the information, if necessary, and return the original to the driver's packet and returns the entire driver's packet to the Safety Department where it will be stored for at least six (6) months.

(App. at 98). The FMCSA granted A.D. Transport's petition, and by letter dated July 3, 2000, A.D. Transport's conditional rating was upgraded to a satisfactory rating.