DARRELL ANDREWS TRUCKING,
INC., Petitioner,

v.

FEDERAL MOTOR CARRIER
SAFETY ADMINISTRATION,
Respondent.

No. 01–1118.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 8, 2002.

Decided July 26, 2002

**1122**

Henry E. Seaton, III argued the cause for petitioner. With him on the briefs were James E. Scapellato and John T. Husk.

Robert Digges, Jr. and Erika Z. Jones were on the brief for amicus curiae American Trucking Associations, Inc. in support of petitioner.

H. Thomas Byron, III, Attorney, U.S. Department of Justice, argued the cause for respondent. On the brief were Robert S. Greenspan and August E. Flentje, Attorneys. Edward R. Cohen, Attorney, entered an appearance.

Before: GINSBURG, Chief Judge, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Darrell Andrews Trucking, Inc., a commercial motor carrier, petitions for review of an order of the Federal Motor Carrier Safety Administration (FMCSA) assigning Andrews a "conditional" safety rating. The agency gave Andrews that rating because it violated a regulation requiring carriers to maintain all documents that support its drivers' records of duty status. The FMCSA found that Andrews removed its drivers' toll receipts from driver-specific files, where they could be used to verify the number of hours a driver was on the road, and commingled them with the receipts of all other drivers so that the tolls could not be used for verification. Andrews challenges the FMCSA's decision on a number of grounds, including a claim that the agency improperly changed its original interpretation of the recordkeeping regulation. We reject that challenge and all of the others but one. We remand the case to the agency for consideration of the sole issue that it failed to address below.

I

Congress has directed the Secretary of Transportation to prescribe regulations establishing a procedure for determining the safety fitness of the owners and operators of commercial motor vehicles. 49 U.S.C. § 31144(b); *see MST Express v. Department of Transp.*, 108 F.3d 401, 402 (D.C.Cir.1997). The Secretary has delegated that responsibility to the FMCSA. 49 C.F.R. § 1.73.[1] Pursuant to Part 385 of

---

1. Motor carriers were initially regulated by the Interstate Commerce Commission. Motor Carrier Act, Pub.L. No. 74–255, 49 Stat. 543 (1935). In 1966, Congress transferred regulatory authority to the Department of Transportation, which delegated it to the Federal Highway Administration (FHWA), which, in turn, promulgated the regulations discussed below. The FMCSA, which has now taken over those responsibilities, was created by the Motor Carrier Safety Improvement Act of 1999, Pub.L. No. 106–159, 113 Stat. 1748.

its regulations, the FMCSA assigns motor carriers one of three possible safety ratings: "satisfactory," "conditional," or "unsatisfactory." 49 C.F.R. § 385.3; *see id.* § 385.7 (listing factors considered in determining safety ratings, including the frequency of accidents and the frequency and severity of regulatory violations); *see generally MST Express*, 108 F.3d at 402–03.[2] The agency conducts compliance reviews, "on-site examination[s] of motor carrier operations," in order "to determine whether a motor carrier meets the safety fitness standard" and which rating it should be assigned. 49 C.F.R. § 385.3; *see id.* § 385.9.

To ensure that truck drivers are awake and alert on the road, Congress has also directed the Secretary of Transportation to prescribe the maximum number of hours they may operate their vehicles in a given time period. *See* 49 U.S.C. § 31502(b). To implement that directive, the FMCSA has promulgated regulations that fix maximum driving times, 49 C.F.R. § 395.3, and require each driver to keep a record of duty status (RODS)[3] that records his or her driving times for each 24-hour period, *id.* § 395.8. In order to permit the FMCSA to ensure compliance with the maximum-hours limitations, the regulations further require each motor carrier to "maintain records of duty status and all supporting documents for each driver it employs for a period of six months from the date of receipt." 49 C.F.R. § 395.8(k)(1).

On November 9, 2000, during an on-site compliance review, FMCSA investigators determined that Andrews had violated agency regulations. The investigators found maximum-hours violations as well as false RODS. Compliance Review, J.A. at 48–49, 55, 57–58. In addition, they cited Andrews for failing to properly maintain supporting documents for the RODS. Specifically, the investigators noted that, although Andrews "receives [an] envelope containing each driver's expenses (toll receipts, fuel receipts, CAT scale receipts, ...)," it separates out the toll receipts and files them "all together" with those of the other drivers. J.A. at 51. The result, the investigators said, is that the "carrier is not able to cross reference toll receipts back to the driver's RODS." *Id.* Moreover, if the toll receipts had been maintained as received, the investigators believed that "more falsification would have been discovered." J.A. at 55. Based on Andrews' treatment of the toll receipts, the investigators cited the carrier for violating § 395.8(k)(1), the recordkeeping regulation. As a consequence of that violation, together with an unrelated citation for an excessively high accident rate, the compliance review assigned Andrews the lowest of the three possible safety ratings: "unsatisfactory." J.A. at 49.

Andrews sought administrative review before the FMCSA. The carrier conceded that it maintained the toll receipts in the ordinary course of its business. *In re Darrell Andrews Trucking, Inc.*, No.2001–8686, slip op. at 8 (FMCSA Jan. 19, 2001). Andrews argued, however, that the receipts were not "supporting documents" within the meaning of § 395.8(k)(1), be-

---

*See* 49 C.F.R. § 1.73. For the sake of convenience, we will refer to both the FMCSA and its predecessor agencies as the FMCSA.

**2.** Although "a carrier that receives a conditional rating is permitted to continue its normal operations," insurance companies use the ratings and shippers consult them when selecting carriers. *MST Express,* 108 F.3d at

403. A carrier that receives an unsatisfactory rating may not transport certain hazardous materials or more than 15 passengers. *Id.* at 403–04 (citing 49 C.F.R. § 385.13).

**3.** For convenience, we will use the abbreviation RODS to refer to both "record of duty status" and "record*s* of duty status."

cause it did not use them to verify the information in its drivers' RODS. It further contended that, even if the toll receipts were supporting documents, the regulation did not require that such documents be kept in a manner that permitted their correlation with the driver to whom they corresponded.

The FMCSA disagreed. First, it concluded that, under § 395.8(k)(1), "supporting documents" include documents that "*can be* used to verify information on the driver's records of duty status"—not only those that the carrier actually does use. *Andrews Trucking,* FMCSA slip op. at 9–10 (emphasis added) (citing Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 62 Fed.Reg. 16,370, 16,425 (Apr. 4, 1997)). Second, the FMCSA thought it reasonable to construe the maintenance requirement as requiring carriers to maintain the documents in a usable condition. *Id.* at 10. As did the investigators, the agency noted that although each Andrews driver turns in a "trip envelope" that contains his or her toll and other receipts, thereafter "the toll receipts are removed and all filed together in one central location." *Id.* at 8. This " 'salad shooter' approach," the FMCSA held, "does not comply with the spirit of the law and frustrates proper enforcement." *Id.* at 11 (quoting *In re A.D. Transport Express, Inc.,* No. 00–05–296052, slip op.. at 5 (FMCSA May 22, 2000), *aff'd, A.D. Transport Express, Inc. v. United States,* 290 F.3d 761 (6th Cir.2002)). In particular, it "frustrates an investigator[']s ability to connect the supporting document (toll receipt) and the RODS," and leaves the investigator "unable to use the toll receipt to check for hours-of service or falsification violations of the driver." *Id.* at 8. Finally, the agency concluded that prior compliance reviews had put Andrews "on notice that [its] method of retention of supporting documents (including toll receipts) does

not conform to the regulatory requirements." *Id.* at 9.

Although the FMCSA upheld Andrews' § 395.8(k)(1) violation, it raised the carrier's overall safety rating to "conditional" because it found that one of the accidents on its record had been non-preventable. *Id.* at 11–13. Andrews now petitions for review of the determination that it violated § 395.8(k)(1). *See* 28 U.S.C. § 2344.

## II

 This court must uphold a decision of the FMCSA unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *El Conejo Americano of Texas, Inc. v. Department of Transp.,* 278 F.3d 17, 19–20 (D.C.Cir.2002). We accord "substantial deference to [an] agency's interpretation of its own regulations," *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994), and will affirm the FMCSA's interpretation of one of its regulations unless "it is plainly erroneous or inconsistent with the regulation itself." *Corridor H Alternatives, Inc. v. Slater,* 166 F.3d 368, 372 (D.C.Cir.1999) (internal quotation marks omitted); *see Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997).

Andrews raises five main challenges to the FMCSA's decision. According to Andrews, the requirement that it maintain each driver's toll receipts, and that it refrain from combining them with the receipts of all other drivers: (i) constitutes a change in the original regulation, promulgated without the required notice and opportunity for comment; (ii) even if not a change, was applied to Andrews without fair notice; (iii) imposes increased and unapproved recordkeeping burdens, in violation of the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3520; (iv) was applied

to Andrews without adherence to proper adjudicatory procedures; and (v) was imposed without consideration of a substantial countervailing consideration. We consider Andrews' five challenges below.[4]

### III

■ Andrews' first argument is that the interpretation of § 395.8(k)(1) upon which the FMCSA based its decision constitutes a substantial change in the agency's construction of that regulation, and that it was unlawful for the agency to make such a change without promulgating a new regulation pursuant to the notice and comment provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 553(c). *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C.Cir.2000) ("It is well-established that an agency may not escape the notice and comment requirements ... by labeling a major substantive legal addition to a rule a mere interpretation."); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C.Cir.1997) ("Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking."). To succeed with this argument, Andrews must show that the "agency has given its regulation a definitive interpretation, and later significantly revise[d] that interpretation." *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C.Cir.1999).

Andrews contends that two elements of the FMCSA's decision represent significant changes from the agency's prior, definitive position. Those are the agency's determinations that: (a) toll receipts that the carrier does not itself use for verification of RODS are "supporting documents" that the carrier must maintain; and (b) the

carrier must not only preserve the toll receipts but also must refrain from removing them from individually identifiable files and combining them in a fashion that makes correlation with individual drivers impossible. We consider each of these determinations below.

### A

■ The FMCSA concluded that Andrews' toll receipts are "supporting documents" because they could be used by the carrier and the agency to check the accuracy of the drivers' RODS. Andrews contends that the term applies only to documents that a carrier actually uses to verify the RODS. Because Andrews does not use toll receipts in its verification process, the carrier contends that it is not required to maintain them.

Section 395.8(k) states:

*Retention of driver's record of duty status.* (1) Each motor carrier shall maintain records of duty status and all supporting documents for each driver it employs for a period of six months from the date of receipt.

49 C.F.R. § 395.8(k). The regulation does not define "supporting documents" and, as a consequence, we are bound to defer to a reasonable agency interpretation. The agency interprets the term as encompassing any document that could be used to support the RODS, and notes that a toll receipt (because it is normally date- and time-stamped) is such a document. Although this may not be the only plausible interpretation of "supporting document," it is hardly unreasonable. The agency further contends that to adopt Andrews' interpretation—which would permit each carrier to exclude from the coverage of

---

4. Andrews raises a number of additional arguments, or variants on the above arguments, which we have considered and rejected but which are too insubstantial for extended discussion.

§ 395.8(k)(1) any document it chose simply by not using it for verification—would eviscerate enforcement of the maximum-hours regulations. While that may be an overstatement of the consequence of adopting Andrews' view, the agency is nonetheless correct in arguing that its own view is consistent with the regulatory purpose and facilitates the agency's ability to ensure the veracity of the RODS and the enforcement of the limits on driving time.

We thus conclude that the FMCSA's current interpretation of § 395.8(k)(1) is a reasonable construction of its regulation. Nonetheless, that interpretation might still trigger the requirements of notice and comment if it represents a significant change from a previous, definitive interpretation. We are unable, however, to discern such a change.

■ In support of its contention that the FMCSA previously interpreted "supporting documents" as limited to those actually "used by" a carrier, Andrews points to a passage from a regulatory guidance that the agency issued in 1993 and repeated verbatim in 1997:

> Supporting documents are the records of the motor carrier which are maintained in the ordinary course of business and *used by* the motor carrier to verify the information recorded on the driver's record of duty status. Examples are: Bills of lading ..., weight/scale tickets, fuel receipts, fuel billing statements, [and] toll receipts....

Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 58 Fed. Reg. 60,734, 60,761 (Nov. 17, 1993), *repeated in* 62 Fed.Reg. 16,370, 16,425 (Apr. 4, 1997) (emphasis added). In focusing on this passage, however, Andrews neglects the two sentences that immediately follow, and that appear to adopt a "can be used" (or "could be used") interpretation:

> Supporting documents may include other documents which the motor carrier

maintains and *can be used* to verify information on the driver's records of duty status.

*Id.* (emphasis added). The regulatory guidance thus offers some support for the positions of both Andrews and the FMCSA, and can only be described as—at best—ambiguous. It cannot be said to mark a definitive interpretation from which the agency's current construction is a substantial departure.

In further support of its argument, Andrews points to a Notice of Proposed Rulemaking (NPRM) that the FMCSA issued in 1998 but never finalized in a promulgated rule. The NPRM was issued in response to Congress' directive, in the Hazardous Materials Transportation Authorization Act of 1994, Pub.L. No. 103–311, § 113, 108 Stat. 1673, that the FMCSA clarify the meaning of "supporting document" and list those supporting documents that a carrier is required to maintain. The statute directed the FMCSA to "prescribe regulations amending part 395 of [C.F.R.] title 49," and to include "[a] provision specifying the number, type, and frequency of supporting documents that must be retained by a motor carrier." *Id.* § 113(a)(1), (b)(2). For purposes of those new regulations, the legislation defined a supporting document as "any document that is generated or received by a motor carrier or commercial motor vehicle driver in the normal course of business that *could be used,* as produced or with additional identifying information, to verify the accuracy of a driver's record of duty status." *Id.* § 113(c) (emphasis added). The congressional directive was not self-executing (and did not indicate whether it was restating or changing the agency's existing interpretation). Hence, because the FMCSA never promulgated the contemplated regulation, the statutory definition does not govern this case. It does, however, provide support for the proposition that the agency's inter-

pretation of "supporting document," as a document that "could be used" to verify the accuracy of a RODS, is reasonable.

Needless to say, this is not the aspect of the NPRM to which Andrews draws our attention. Instead, it contends that statements in the notice show that the FMCSA understood its original 1982 interpretation of supporting documents as limited to documents actually used by the carrier. But the 1998 NPRM is no less ambiguous (or, perhaps better put, no less self-contradictory) than the guidances that preceded it. The NPRM does state, as Andrews notes, that:

> The FMCSA intended that the term "supporting document" refer to those specific documents, and only those specific documents, that a motor carrier used in its internally-developed system or program to verify the accuracy of the driver's duty activities. It was not meant to encompass all records, but only those that were, indeed, *used by* the motor carrier, to verify the dates, times, and locations the driver recorded.

Hours of Service of Drivers; Supporting Documents, 63 Fed.Reg. 19,457, 19,459 (Apr. 20, 1998) (emphasis added). But two sentences later, the NPRM destroys this clarity by stating:

> The regulatory guidance stated that supporting documents are the records of the motor carrier maintained in the ordinary course of business that are used, *or could be used,* by the motor carrier to verify the information recorded on a driver's record of duty status.

*Id.* (emphasis added). Moreover, the NPRM then goes on to state that it is "proposing to use the statutory definition of supporting documents as provided by Congress in the Act," *id.*—i.e., the "could

be used" definition—and declares that, because "since 1982, [the FMCSA] has required that all supporting documents must be collected and kept for six months[,] [t]his collection of documents ... is not a new paperwork burden." *Id.* at 19,464. In short, although "ambiguous" may be too charitable a word to describe these conflicting passages in the NPRM, the one thing that is clear is that the document cannot be regarded as a definitive acknowledgment that the agency had previously regarded "used by" rather than "could be used" as the appropriate interpretation of "supporting documents."

Finally, we note that, while its Federal Register notices are less than clear, the agency's prior informal adjudication on this issue is quite clear and completely in accord with the view of "supporting documents" relied upon by the FMCSA below. In *In re National Retail Transportation, Inc.,* No. R1–92–03 (FMCSA Sept. 12, 1996), the FMCSA rejected a carrier's claim, identical to that of Andrews, that the term "supporting documents" should be limited to "those that the motor carrier uses—instead of could have been used—for log verification." *Id.,* FMCSA slip op. at 6. If supporting documents were defined as the carrier urged, the FMCSA continued, "motor carriers could always escape responsibility for retaining them merely by saying that they do not use them." *Id.* Instead, the agency said, § 395.8(k)(1) "provided [the carrier] with reasonable notice of a duty to keep ordinary business documents so that the record of duty status of its drivers could be verified"—specifically including documents containing "information such as mileage, origin, destination, stops, expenses, [and] *tolls." Id.* at 5 (emphasis added).[5]

---

**5.** Another FMCSA decision cited by Andrews, *In re Ace Doran Hauling & Rigging Co.* (FMCSA Feb. 24, 2000), is inapposite. That case involved the question of whether a motor

carrier was required to obtain and retain the toll receipts of drivers who, unlike Andrews' drivers, were owner-operators rather than employees. The agency concluded that "the

In sum, in the midst of the period in which the FMCSA issued the ambiguous guidances relied upon by Andrews, it issued a clear decision that confirms the interpretation applied by the agency in this case. Andrews is therefore unable to show that the decision below represents a substantial change in the agency's construction of § 395.8(k)(1).

### B

■ Andrews further contends that, even if toll receipts are supporting documents and therefore must be maintained, § 395.8(k)(1) does not require motor carriers to maintain them in a way that permits the FMCSA to match them with their corresponding drivers. Andrews argues that the phrase, "shall maintain ... all supporting documents for each driver," requires maintenance only and does not specify the manner in which the documents must be maintained. The agency, by contrast, argues that "maintain" is reasonably construed to mean maintain in a usable condition: here, that the carrier may not take documents that it receives in a format that permits identification of individual drivers, and then merge them so that the individual identifications are lost. Once again, we find the agency's interpretation reasonable.

Although § 395.8(k)(1) does not define "maintain," it is hardly arbitrary to construe the regulation in light of its purpose—which is to ensure "the enforceability of the hours of service regulations and ... the protection to the public which these regulations provide." Driver's Logs, 47 Fed.Reg. 7702, 7702 (Feb. 22, 1982). If the carrier maintains the toll receipts

(which usually do not have the individual driver's name on them) in the manner in which they arrive at its office—i.e., in the individual driver's trip envelope—it is possible for both the carrier and the FMCSA to enforce those regulations. If, instead, Andrews removes the receipts and, without copying or otherwise marking them, combines them with the receipts of all other drivers, correlation with individual drivers becomes impossible and the purpose of the regulation is frustrated. It is thus not unreasonable for the agency to read "maintain" in a way that bars the latter practice.

Andrews seeks support for its position in the following passage from the 1993 and 1997 guidances cited above:

> Supporting documents may include other documents which the motor carrier maintains and can be used to verify information on the driver's records of duty status. *If these records are maintained at locations other than the principal place of business but are not used by the motor carrier for verification purposes,* they must be forwarded to the principal place of business upon a request by an authorized representative of [the FMCSA] or State official within 2 business days.

58 Fed.Reg. at 60,761, *repeated in* 62 Fed. Reg. at 16,425 (emphasis added). Andrews contends that the italicized clause recognizes that a carrier may keep records that it does not use for verification, like the toll receipts in this case, at a location remote from the place at which it keeps the driver's RODS. But while Andrews is correct in concluding that supporting docu-

---

supporting documents rule is not applicable to toll receipts received by [Ace Doran's] owner operator drivers since [Doran] does not reimburse them for highway tolls ... and therefore does not, in the normal course of business, require these drivers to submit toll

receipts." *Id.,* FMCSA slip op. at 2. Here, by contrast, there is no dispute that Andrews does reimburse its drivers, and does require them to submit toll receipts in the ordinary course of its business.

ments may be removed from their original location, the passage also makes clear that the documents must quickly be returned upon the request of an FMCSA investigator. And since the investigator's purpose in requesting return is to permit verification of the information in the driver's RODS, it is not unreasonable for the agency to insist that, *if* the documents are removed, they must be handled in a fashion that permits them to be matched with their original driver.

Andrews also contends that the FMCSA's decision in this case amounts to the de facto adoption of a recordkeeping requirement considered but rejected in the 1998 NPRM. Like that requirement, Andrews asserts, the FMCSA decision requires the carrier to "toe tag" (label by driver) every supporting document, create a system of cross-indexing, and then file each document accordingly. But that is not an accurate description of the decision below. This case involves a document (a toll receipt) that Andrews concedes it receives in the ordinary course of business, and that it receives in a manner (inside the driver's trip envelope) that permits identification of the driver who submitted it. All the FMCSA's decision requires is that Andrews retain such documents (for six months) and refrain from destroying the agency's ability to match them with their associated drivers by taking them out of their original envelopes and tossing them into a common pile. In short, the FMCSA's decision does not require Andrews to index these documents; it merely bars the carrier from de-indexing them (at least without copying or labeling them first).[6]

Our conclusion, that the FMCSA has reasonably interpreted § 395.8(k)(1) as barring Andrews from irretrievably commingling its drivers' toll receipts, is in accord with the views of the only other circuit to have considered the question. In *A.D. Transport Express, Inc. v. United States*, the Sixth Circuit considered the FMCSA's conditional rating of a motor carrier that, like Andrews, treated its drivers' toll receipts in a fashion that prevented their comparison with the associated driver's RODS. 290 F.3d 761 (6th Cir. 2002), *aff'g In re A.D. Transport Express, Inc.*, No. 00–05–296052 (FMCSA May 22, 2000). A.D. Transport received a driver's packet from each driver, containing (inter alia) the driver's toll receipts, bills of lading, fuel receipts, and logs. When the payroll department finished with the toll receipts, it "lumped" the receipts for all its drivers "into one large envelope" for each month of the year—making correlation of receipts and drivers impossible. The FMCSA found A.D. Transport to have violated § 395.8(k)(1), holding that "supporting documents must be maintained by the carrier in a manner that will allow an agency investigator to compare those documents to the RODS." *In re A.D. Transport*, FMCSA slip op. at 5, *quoted in A.D. Transport*, 290 F.3d at 766.

The Sixth Circuit affirmed, concluding that "the FMCSA's interpretation of 49 C.F.R. § 395.8(k) is reasonable and consistent with the language of the regulations." *A.D. Transport*, 290 F.3d at 766. It found that A.D. Transport's practice "rendered the toll receipts nearly useless in verifying a driver's RODS," and that while it was semantically possible to con-

6. Similarly, in *A.D. Transport,* discussed below, the FMCSA emphasized that the toll receipts at issue there were "already grouped nicely together by driver" when the carrier received them. *In re A.D. Transport,* FMCSA slip op. at 6. It was only the "carrier[']s own

overt action that resulted in the separation of the supporting documents from the RODS without first taking proper steps to cross reference the documents back to the driver's RODS." *Id.*

strue "maintain" as requiring nothing more than what A.D. Transport did, the FMCSA's interpretation better served the statutory purpose of promoting the safe operation of commercial motor vehicles. *Id.* at 767. Finally, the court also held that, because the FMCSA's decision "did nothing more than interpret an existing regulation" and "did not change any existing law or policy," it "was an interpretative rule exempt from the notice and comment requirements of the Administrative Procedure Act." *Id.* at 768. We are in accord with the views of the Sixth Circuit, and therefore reject the claim of the petitioner here.[7]

## IV

Andrews' next argument is that, even if the FMCSA's interpretation of § 395.8(k)(1) is reasonable and unchanged, "Andrews had no fair notice that its satisfactory safety rating was in jeopardy" for failing to maintain its drivers' toll receipts in an identifiable fashion. Andrews Br. at 18. In *General Electric Co. v. EPA,* we held that "[i]n the absence of notice—for example, when the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." 53 F.3d 1324, 1328–29 (D.C.Cir.1995).[8] As the discussion in Part III.A suggests, there is something to An-

drews' argument that the agency has been less than clear as to whether the term "supporting documents" extends to records, like Andrews' toll receipts, that could be but are not actually used by a carrier to verify its drivers' RODS. Although the regulatory language may not itself be so unclear as to implicate the *General Electric* rule, the self-contradictory "clarifying" utterances of the agency could have left a carrier confused about what was required of it. For that, the agency has no one but itself to blame. Despite Congress' 1994 direction that the FMCSA issue a regulation elucidating the term's coverage, the agency has still inexplicably failed to act.

Notwithstanding the ambiguity of the regulatory guidances, however, the FMCSA's 1996 opinion in *National Retail Transportation* was crystal clear on this point. It expressly rejected the claim that supporting documents are only those a motor carrier actually uses, and specifically listed tolls as the kind of information included within the realm of "supporting documents."[9] Moreover, Andrews' early reaction to its 2000 citation strongly suggests that the employer was not in doubt that § 395.8(k)(1) requires it to maintain toll receipts. The carrier's petition for administrative review did not dispute that toll receipts are supporting documents, but claimed only that the regulation did not

7. Andrews correctly notes that, although the Sixth Circuit opinion does not mention it, the carrier in *A.D. Transport,* unlike Andrews, used the toll receipts to verify the accuracy of its drivers' RODS. *See In re A.D. Transport,* FMCSA slip op. at 2, 3. That fact, however, goes only to the question of whether the toll receipts should be characterized as "supporting documents," not to the manner of their retention. As we have concluded that Andrews' toll receipts are supporting documents regardless of whether they are actually used for RODS verification, the Sixth Circuit's decision is directly on point regarding how such documents must be maintained.

8. *General Electric* applies where the a party is deprived of "property," or where "sanctions are drastic." *Id.* at 1328–29. Because we conclude that Andrews received fair notice, we need not decide whether the issuance of a "conditional" rating meets those prerequisites.

9. Although Andrews contends that the FMCSA's decisions are not widely available, it concedes that they are available on the FMCSA website. Andrews Br. at 17 n.7. That is sufficient notice for a well-represented regulated entity as intensely interested in the issue as is Andrews.

require that "all supporting documents [be] filed by each driver." J.A. at 7 (emphasis omitted). Similarly, the affidavit of Andrews' safety director acknowledged that "I retain toll receipts for at least six months to comply with 49 C.F.R. 395.8(k)." Jones Aff. at 2 (J.A. at 14).[10] Indeed, despite the legal arguments Andrews raises here, the fact is that Andrews does retain its toll receipts: the carrier was not downgraded for not having toll receipts, but for refiling them in a manner that left them useless.

■ The only remaining question, therefore, is whether Andrews had sufficient notice that the FMCSA regarded Andrews' practice of combining drivers' toll receipts as a violation of § 395.8(k)(1). On that point, this court has no doubt. Under *General Electric,* an "agency's pre-enforcement efforts to bring about compliance will provide adequate notice." 53 F.3d at 1329. And as the agency points out, Andrews was the subject of many such efforts.

In response to the fair notice argument below, the FMCSA held that Andrews "has previously been put on notice that [its] method of retention of supporting documents (including toll receipts) does not conform to the regulatory requirements," specifically citing Andrews' March 1997 compliance review. *Andrews Trucking,* FMCSA slip op. at 9. In that review, Andrews was cited for violating § 395.8(k)(1), because its drivers had submitted "[f]alse reports of record of duty status" and because "supporting documents are not identifiable to the driver[']s

corresponding record of duty status." J.A. at 62. The review went on to advise Andrews to "ensure all documents supporting records of duty status (*such as toll,* fuel[,] repair and other on-the-road expense *receipts ...*) ... are identified to the corresponding drivers' record of duty status." J.A. at 63 (emphasis added).[11]

Nor was March 1997 the first or last time Andrews was warned prior to the instant citation. In Andrews' July 1991 compliance review, the FMCSA discovered ten instances in which drivers had falsified their RODS. Administrative Record (A.R.) doc. 12, at 2. Andrews was cited for not having "a system to effectively control the drivers' hours of service." *Id.* at 6. The investigators specifically noted: "Carrier has change[d] his method of filing documents since the last prosecution. Toll records are thrown in a box." *Id.* at 7. Thereafter, in a September 1993 compliance review, Andrews was again cited for allowing drivers to submit "[f]alse reports of records of duty status," and for allowing drivers to drive in excess of the maximum-hour limitations. A.R. doc. 14, at 2. The FMCSA specifically noted that Andrews had "reduce[d] the probability of identifying a false record of duty status by mainta[in]ing toll receipts by payroll period, not by driver." *Id.* at 5. Finally, in a December 1997 compliance review, the investigators once again noted that Andrews had "taken the toll tickets from the driver's expense envelope and placed these documents in a box with other driver[s'] toll tickets." A.R. doc. 18, at 6. This meant, the investigators said, that the toll receipts

---

10. Andrews did dispute that toll receipts are supporting documents in the brief it filed in support of its administrative appeal. J.A. at 38.

11. Andrews contends that it was entitled to regard this advice as optional because it was listed in a part of the compliance review sheet

labeled "Recommendations." In light of the other instructions listed under the same heading, that was not a reasonable reading. *See* J.A. at 63 (requiring Andrews, inter alia, to "ensure all drivers are fully and properly qualified," "maintain all required controlled substance testing records," and "ensure all drivers' records of duty status are accurate").

could not "be used to check the driver's logs for accuracy." It "appear[ed]," they continued, that "the carrier has taken steps to make it difficult to determine if the drivers are in a specific location at a certain time." *Id.*[12]

Nor were these citations Andrews' only notice of the FMCSA's interpretation of the recordkeeping requirements. As we have discussed above, six months before it issued the citation to Andrews, the FMCSA held in *A.D. Transport* that a carrier's practice of removing toll receipts from its individual drivers' packets and combining them in large envelopes violated § 395.8(k)(1) and warranted a conditional safety rating. *In re A.D. Transport,* FMCSA slip op. at 6. Thus, even if nothing else did, *A.D. Transport* put Andrews squarely on notice that it should cease the filing practices against which it had been repeatedly warned throughout the 1990s. This is not a case in which a regulated entity required "extraordinary intuition or ... the aid of a psychic" to anticipate being found in violation of a regulation. *United States v. Chrysler Corp.,* 158 F.3d 1350, 1357 (D.C.Cir.1998). Rather, it is a case in which the carrier persisted in its ways despite clear and repeated warnings from the relevant government agency. Andrews, therefore, can find no refuge in the doctrine of fair notice.

## V

▪ Andrews also argues that the requirement that toll receipts be retained, and retained in a way that permits the FMCSA to match them to its drivers' RODS, violates the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3520. That statute bars the enforcement of a recordkeeping requirement unless it is first approved by the Office of Management and Budget (OMB). *Id.* §§ 3507, 3512. The FMCSA does not dispute the application of the Act to the recordkeeping requirements of § 395.8(k)(1), but argues that the statute has been satisfied because OMB approved the regulation when it was promulgated in 1982. *See* Driver's Logs, 47 Fed.Reg. 53,-383, 53,383 (Nov. 26, 1982); *see also* 63 Fed.Reg. at 19,464 (referring to past OMB approvals of § 395.8(k)(1) recordkeeping requirements).

Andrews contends that the original approval by OMB is insufficient because the FMCSA has materially changed the meaning of the regulation, and that the new meaning amounts to a new recordkeeping burden regardless of whether the agency acknowledges the point by promulgating a new rule. *See* 44 U.S.C. § 3507(h)(3) (providing that "an agency may not make a substantive or material modification to a collection of information after such collection has been approved by [OMB], unless the modification has been submitted to [OMB] for review and approval"). This argument has little traction, however, as we have already accepted the agency's position that its current interpretation does not depart from the original. Andrews might nonetheless prevail if it could demonstrate that, whatever the FMCSA thought in 1982, OMB understood the regulation differently. But this Andrews cannot do either, as the 1982 announcement of OMB approval did not describe what docu-

---

**12.** Andrews urges us not to consider these prior compliance reviews, on the ground that they were not relied upon by the FMCSA below and were outside the administrative record. Andrews is wrong on both counts. In the FMCSA opinion, the associate director for motor carriers stated: "I have reviewed the prior CRs [compliance reviews] conduct-ed on this carrier and conclude that Darrell Andrews Trucking has previously been put on notice...." *Andrews Trucking,* FMCSA slip op. at 9. Moreover, the certified index to the administrative record makes clear that the compliance reviews of July 1991, September 1993, March 1997, and December 1997 were all part of that record. *See* J.A. at 3–4.

ments either agency thought were within the scope of the regulation. *See* 47 Fed. Reg. at 53,383.

In a related vein, Andrews argues that the FMCSA's latest estimate of the burden posed by its current interpretation is substantially higher than its estimate of the burden of the original rule. If true, this could suggest that the agency is indeed requiring more than it did when the rule was first promulgated.[13] The cited estimates, however, do not support Andrews' argument.

Once again, the document Andrews points to is the 1998 NPRM. There, the FMCSA stated that it believed the burden imposed by fully implementing the Hazardous Materials Transportation Authorization Act of 1994 "would be more than is currently expected" and "at least 219,095,-423 hours." 63 Fed.Reg. at 19,465. Although the NPRM did not state the "currently expected" burden, Andrews points to a roughly contemporaneous submission by the Department of Transportation that put the figure at 14,284,339 hours.[14] Andrews contends that the difference results from the Hazardous Materials Act's requirement that all documents that "could be used" to verify RODS must be retained and indexed, while the original regulation required nothing more than retention of those documents that actually are used to verify RODS.

The 1998 NPRM, however, does not corroborate Andrews' argument. The estimated 219,095,423-hour burden was not for maintaining, in the manner in which they were received by the carrier, all documents that could be used to verify a driver's RODS. To the contrary, the agency indicated that merely defining supporting documents as the 1994 Act defined them (i.e., as those that "could be" used) "is not a new paperwork burden." *Id.* at 19,464. The "collection of documents" under that definition, the FMCSA said, "has been calculated into past paperwork burden approvals of the Office of Management and Budget." *Id.* Rather, the 219-million-hour burden was for a new rule the agency considered but did not propose: a rule that would have required carriers to "audit each one" of 23 supporting documents for a minimum of five items, "compare the documents to the RODS," and "fil[e] and stor[e] the 23 records." *Id.* at 19,465. That was the task the agency said was "more than is currently expected" and that it rejected as too burdensome. *Id.* And as we have explained in Part III.B above, that is not the task required by the decision below.

In sum, because the FMCSA's decision in this case relies upon a reasonable interpretation of a regulation previously cleared by OMB under the Paperwork Reduction Act, and does not represent the imposition of a new rule or recordkeeping burden, the Act does not bar enforcement of the interpretation against Andrews.[15]

## VI

Andrews further contends that, in reaching its decision to downgrade the carrier's safety rating, the FMCSA violated the

---

**13.** However, because the paperwork burden of a regulation is measured by computing the total number of "burden hours" it imposes on a nationwide basis, an increased burden may only indicate that there are now more carriers, more drivers, and more documents of the same kind than there were in 1982. *See, e.g.,* FHWA, Paperwork Reduction Act Submission, Supporting Statement at 6 (July 30, 1998).

**14.** FHWA, Paperwork Reduction Act Submission, Supporting Statement at 6.

**15.** For the same reason, we reject Andrews' assertion that the FMCSA violated the Regulatory Flexibility Act, 5 U.S.C. §§ 601–612, by effectively issuing a new rule without undertaking a cost-benefit analysis to determine the rule's impact on small business.

procedural requirements of both the APA and the Constitution. In particular, it contends that the FMCSA improperly denied its request for an oral hearing and discovery. These arguments require only brief mention.

██ Andrews argues that it was entitled to an oral hearing and discovery by the provisions of 49 C.F.R. §§ 386.35 and 386.43. The FMCSA, however, held that those provisions do not apply to the downgrading of a safety rating under Part 385, but only to three specific types of proceedings under Part 386, none of which is at issue here. *Andrews Trucking*, FMCSA slip op. at 3. This court has previously reached the same conclusion. *See MST Express*, 108 F.3d at 405 (holding that the procedures of Part 386 do not apply to a proceeding to determine a carrier's safety rating, and that "a carrier that disputes its safety rating is not entitled to an administrative hearing"). Nor is there anything in the APA or any relevant statute that requires these procedural incidents for informal adjudications like this one. Accordingly, we are powerless to order the agency to do more. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978); *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 789–90 (D.C.Cir.2000); *see also Trailways Lines, Inc. v. ICC,* 766 F.2d 1537, 1546 (D.C.Cir.1985) ("The conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance and will not, barring the most extraordinary circumstances, warrant the Draconian sanction of overturning a reasoned agency decision.").

██ Andrews' additional contention, that not providing an oral hearing and discovery (principally regarding the unreliability of toll records) violates the Due Process Clause of the Constitution, is also groundless. Without deciding whether the conditional safety rating at issue deprives Andrews of the kind of protected interest that triggers application of the clause, *see Lepelletier v. FDIC*, 164 F.3d 37, 45 (D.C.Cir.1999), it is clear that Andrews did receive due process here. The FMCSA citation put Andrews on notice of the charges, Andrews had an opportunity to present its arguments through written briefs, and the carrier similarly had an opportunity to present evidence of the unreliability of toll receipts by affidavit. Procedural due process requires no more in this kind of administrative setting. *See Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1199–200 (D.C.Cir.2000).

## VII

██ Finally, we consider Andrews' argument that it was arbitrary and capricious for the FMCSA to downgrade the carrier's safety rating, based on its treatment of toll receipts, when evidence shows that such receipts are unreliable. In support, Andrews submitted an affidavit from its safety director, stating: "Toll receipts are not used to verify logs because they have proven to be unreliable. On many occasions authorities mass produce toll receipts in order to handle peak traffic volumes. Consequently, drivers often have receipts that do not reflect the actual time the driver is at that location." Jones Aff. at 2 (J.A. at 14). The FMCSA's decision did not address Andrews' contention regarding the reliability of toll receipts.

Andrews' argument is a substantial one, and requires an answer from the agency. *See Frizelle v. Slater*, 111 F.3d 172, 177 (D.C.Cir.1997) (concluding that an agency decision was arbitrary because it did not respond to non-frivolous arguments that could affect the agency's ultimate disposition). If Andrews is correct, and toll receipts are in fact unreliable (and misleading) records of the time drivers are actually on the road, then it might well be arbitrary and capricious for

the agency to regard such worthless records as "supporting documents" and to downgrade a carrier for failing to retain them. Of course, we have no idea whether Andrews is correct on this point. In *National Retail Transportation,* for example, the agency rejected a similar argument on the ground that there were serious flaws in the evidence of unreliability offered by the motor carrier. *National Retail Transportation,* FMCSA slip op. at 5–6. Perhaps that is the case here as well. But without any explanation at all by the agency, we cannot use that as a ground for affirming its decision. *See American Mun. Power—Ohio, Inc. v. FERC,* 863 F.2d 70, 73 (D.C.Cir.1988) ("[W]e cannot uphold the agency's decision 'on the same basis articulated' where the agency's decision articulates none." (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962))). We must therefore remand the case so that the FMCSA may answer this argument. *See Iowa v. FCC,* 218 F.3d 756, 759 (D.C.Cir. 2000) (remanding where agency failed to address substantial argument).

### VIII

We conclude that the FMCSA reasonably interpreted the relevant regulation, provided Andrews with fair notice of that interpretation, complied with the requirements of the Paperwork Reduction Act, and afforded the carrier appropriate process before downgrading its safety rating. However, because the agency failed to address a significant challenge to the rationality of its decision in this case, we remand the case to the agency for further proceedings consistent with this opinion.

*Remanded.*