DISSENT
CLAY, Circuit Judge,
dissenting.
In this petition for review, the Ohio Department of Medicaid (“Ohio”) asks us to require the Secretary of Health and Human Services (“the Secretary”) to follow his department’s own published regulations and grant federal Medicaid funds for Ohio’s juvenile pretrial detainees, a class of persons living “in a public institution for a temporary period pending other arrangements appropriate to [their] needs.” 42 C.F.R. § 435.1010(b). The Secretary rejected Ohio’s request because juvenile pretrial detainees do not “voluntarily” reside in a public institution, even though this “voluntariness” requirement does not appear in either the Medicaid Act (“the Act”) or the Secretary’s regulations, and conflicts with the Secretary’s own interpretation of § 435.1010(b).
In granting agency deference to the Secretary’s confused and internally contradictory decision and rationale, the majority commits several serious legal errors that threaten to undermine the public’s ability to hold federal agencies to their own regulations. Because I do not believe that Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny either require or permit the unwarranted expansion of administrative deference effectuated by the majority’s opinion, I respectfully dissent.
I. The Secretary’s Position Should Not Receive Administrative Deference
The majority first goes astray by permitting the Secretary to ground his denial of Ohio’s Medicaid funding request in his interpretation of the Medicaid Act, even though the Secretary has already promulgated regulations that comprehensively interpret the Act’s relevant provisions—regulations that ostensibly cany the force of law. In so doing, the majority effectively permits the Secretary to ignore his regulations whenever they are inconvenient, *483 sending a troubling signal that while states and the public must obey federal regulations, the regulators themselves are not so bound.
A. Chevron Deference
A typical Chevron case presents the following scenario: an administrative agency takes an adverse action against a plaintiff based on its interpretation of its authorizing statute, and the plaintiff petitions for review of that decision, arguing that the agency’s interpretation was not a permissible construction of the statute. In most cases, we defer to the agency’s statutory interpretation, because the agency is ordinarily considered to be better situated than a federal court to weigh the competing policy concerns animating the statute and fill any regulatory gaps left by Congress. See Chevron, 467 U.S. at 844, 104 S.Ct. 2778 (The “principle of deference to administrative interpretations ... has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.” (citation and internal quotation marks omitted)). However, as explained below, this case differs from an ordinary Chevron case in key respects that counsel against applying the doctrine here.
“The Medicaid program was established in 1965 in Title XIX of the [Social Security] Act ‘for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons.’” Schweiker v. Hogan, 457 U.S. 569, 571, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982) (quoting Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)). For purposes that are relevant here, the Medicaid Act requires that this federal financial assistance be provided with respect to all persons receiving state Medicaid benefits, see 42 U.S.C. § 1396a(a)(10)(A), except that such funds are not available “with respect to care or services for any individual who is an inmate of a public institution (except as a patient in a medical institution).” Id. § 1396d(a)(29)(A) (“the inmate exclusion provision”).
The Act does not define which persons qualify as “inmate[s] of a public institution.” The Act does, however, vest the Department of Health and Human Services with the authority to interpret its provisions and promulgate regulations carrying the force of law. See, e.g., Douglas v. Independent Living Ctr. of S. Cal., Inc., 565 U.S. 606, 615, 132 S.Ct. 1204, 182 L.Ed.2d 101 (2012). Thus, ordinarily, we would be required to defer to the Secretary’s interpretation of the inmate exclusion provision as long it was not flatly contradicted by the Act’s text, and was otherwise reasonable. Chevron, 467 U.S. at 843, 845, 104 S.Ct. 2778.
However, this case deviates from a typical Chevron case in a crucial respect: before this dispute ever arose, the Centers for Medicare and Medicaid Services (“CMS”), the sub-division of the Department of Health and Human Services that administers the Medicaid program, had already issued comprehensive regulations interpreting the inmate exclusion provision. See 42 C.F.R. § 435.1010 (defining both “inmates” and “public institutions” and setting forth exceptions); Maj. Op. at 478-81. Relevant here, relying on its considered judgment and policy expertise, CMS determined that Congress would not consider
An individual ... an inmate if—
[[Image here]]
*484 (b) He is in a public institution for a temporary perio.d pending other arrangements appropriate to his needs.
42 C.F.R. § 435.1010(b). Ohio has never argued that § 435.1010(b) was an unlawful or otherwise impermissible interpretation of the Act; rather, it has simply argued that its juvenile pretrial detainees are persons living “in a public institution for a temporary period pending other arrangements appropriate to [their] needs,” and are thus not inmates under the Secretary’s own regulations.
In his briefing before this Court, the Secretary argues that providing juvenile pretrial detainees federal Medicaid funds would be inconsistent with the text and purpose of the Medicaid Act’s inmate exclusion provision, and asks us to give its interpretation Chevron deference. The majority obliges. Maj. Op. § II.A. However, the Secretary does not seriously grapple with a critical threshold question: Why is Chevron applicable to this situation at all? The Secretary has already issued a binding regulatory framework defining which persons constitute “inmates” as that term is used in the Medicaid Act. It stands to reason that our inquiry should be focused on whether juvenile pretrial detainees are “inmates” under that framework, unless the framework itself constitutes an impermissible construction of the inmate exclusion provision. This conclusion is necessary to give the regulations legal force; after all, the regulations are ‘essentially meaningless if the Secretary can ignore them in making subsequent policy decisions and justify each new decision by re-interpreting the Medicaid Act.
The majority justifies sidelining § 435.1010(b) in its analysis by implying that the only permissible construction of the inmate exclusion provision is that it excludes Medicaid funds for juvenile pretrial detainees. See Maj. Op. at 474-76 (concluding that the plain language of the word “inmate” necessarily encompasses pretrial detainees regardless of age); id. at 476-77 (stating that if § 435.1010(b) permitted Medicaid funds for juvenile pretrial detainees, it would be “overbroad,” and thus invalid). The majority thus argues that Ohio’s “chances” cannot be “better” under § 435.1010(b) than they would be under the inmate exclusion provision because CMS “cannot ‘override Congress’ with a regulation permitting broader coverage than the Medicaid Act itself.” Maj. Op. at 476 (quoting La. Pub. Serv. Comm’n v. F.C.C., 476 U.S. 355, 375, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)).
The majority misses the point of Ohio’s argument. Ohio is not arguing that § 435.1010(b) is “broader” than the inmate exclusion provision. Rather, it argues that: (i) CMS legitimately exercised the regulatory authority delegated to it by Congress to interpret “inmate[s] of a public institution” as excluding persons in “a public institution for a temporary period pending other arrangements appropriate to [their] needs;” and (ii) juvenile pretrial detainees are not “inmate[s]” as CMS has interpreted that term.
As the majority acknowledges, the inmate exclusion provision is “silent regarding the precise question at issue here— whether the term ‘inmate’ encompasses juvenile pretrial detainees[.]” Maj. Op. at 474 (emphasis added). When Congress “is silent or ambiguous with respect to [a] specific issue” in a statute, it implicitly delegates its authority to fill that regulatory gap to the administrative agency charged with implementing the statute, and courts must defer to the agency’s construction as long as it does not upset the core policy priorities set forth in the statute’s text. Chevron, 467 U.S. at 843-45, 104 S.Ct. 2778. CMS exercised the authority Congress gave it to create legally binding in *485 terpretive rules when it promulgated § 435.1010(b),[1] and no party to this case has argued that this regulation exceeded the agency’s authority under the Medicaid Act. Absent any such challenge, we should presume the regulation’s validity and hold the Secretary to it, rather than analyzing whether the Secretary was permitted to issue the regulation in the first place. See Powers v. Hamilton Cty. Pub. Defender Comm’n, 501 F.3d 592, 610 (6th Cir. 2007) (“Courts generally do not decide issues not raised by the parties.” (citation omitted)).
Taking this course would be consistent with settled principles of administrative law. When an agency promulgates “valid and reasonable” regulations that “authoritatively construe” ambiguous statutory text, “it is ... meaningless to talk about a separate cause of action to enforce the regulations apart from the statute.” Alexander v. Sandoval, 532 U.S. 275, 284, 121 S.Ct 1511, 149 L.Ed.2d 517 (2001). In this context, an action seeking to enforce the regulations by definition seeks to enforce the statute itself, because Congress left it up to the agency to develop a method of enforcing the statute’s text. See id. Thus, Ohio is not seeking to enforce § 435.1010(b) because' it thinks that it has a better chance of prevailing under that regulation than the Medicaid Act; it is seeking to enforce § 435.1010(b) because that regulation is the governing law implementing the inmate exclusion provision, and must be enforced unless the regulation is ultra vires. And to reiterate: no party to this litigation has argued , , that § 435.1010(b) is invalid or overbroad.
The majority’s approach effectively permits the Secretary to ignore his own interpretive regulations when it suits him and resolve policy questions on an ad hoc basis by offering supplemental interpretations of the Medicaid Act. This cannot be correct. As the majority acknowledges, the Secretary’s statutory interpretations are supposed to “have the force of law.” Maj. Op. at 474 (quoting Pharm. Research & Mfrs. of Am. v. Thompson, 362 F.3d 817, 822 (D.C. Cir. 2004)). This means that when “an agency promulgates regulations, it is bound by those regulations, and it may not attempt to subvert the rulemaking process through interpretation unsupported by the regulation’s language.” Ohio Cast Prods., Inc. v. Occupational Safety & Health Review Comm’n, 246 F.3d 791, 794 (6th Cir. 2001); Fluor Constructors, Inc. v. Occupational Safety & Health Review Comm’n, 861 F.2d 936, 940 (6th Cir. 1988). In other words, when an agency promulgates interpretive regulations, those regulations serve as a constraint on the agency’s later interpretive authority, and do not permit the agency to selectively ignore its prior interpretations just.because they later prove inconvenient.[2] After all, regulations could hardly be said to carry the force of law if they bind only the public, and not the agency that administers them. Cf. Dismas Charities v. U.S. Dep’t of Justice, 401 F.3d 666, 681 (6th Cir. 2005) (“An interpretive *486 regulation is binding on an agency ... by virtue of the binding nature of the interpreted statute.” (emphasis omitted)).
The majority’s willingness to permit the Secretary to ground his denial of Ohio’s Medicaid funding request in the text of the inmate exclusion provision, without reference to § 435.1010(b), thus creates a host of problems for members of the public trying to make sense of the federal government’s voluminous regulations. The public must follow the regulations, or be subject to potential penalties and other adverse action. But the public cannot be equally sure that the federal government will consider itself bound by the interpretive framework set forth in its regulations. Under the majority’s theory, if the government determines that an application of its regulations would be inconvenient in a given context, the government can simply ignore them and ground its decision in a supplemental interpretation of its authorizing statute, confident that this Court will not only approve its end-run around its own regulations, but grant Chevron deference to its contradictory supplemental interpretation. Federal agencies already enjoy near-conclusive deference in interpreting their own regulations. See Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). They should not be free to altogether ignore those regulations. Rules that “have the force of law” should carry more heft than the majority has assigned them today.
Accordingly, this dispute should be cab-ined to the narrower question of whether juvenile pretrial detainees are persons “living in a public institution for a temporary period pending other arrangements appropriate to [their] needs” within the meaning of § 435.1010(b). Because this question involves assessing whether the Secretary permissibly interpreted his own regulations, and not whether he appropriately construed the inmate exclusion provision, the Chevron framework should not apply. See, e.g., Cole v. U.S. Atty. Gen., 712 F.3d 517, 531 (11th Cir. 2013) (“Chevron deference applies only to an ‘agency’s construction of the statute which it administers.’ ” (quoting Chevron, 467 U.S. at 842, 104 S.Ct. 2778)); Alkabsh v. United States, 733 F.Supp.2d 929, 934 (W.D. Tenn. 2010) (Donald, J.) (“Chevron applies only when an agency adopts a construction of a statute that it administers.”).
B. Auer Deference
The majority alternatively justifies its holding by granting the Secretary’s interpretation of § 435.1010(b) conclusive deference under Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). This too was error.
In Auer, the Supreme Court held that an agency’s interpretation of its own regulations is “controlling unless ‘plainly erroneous or inconsistent with the regulation.’” Id. at 461, 117 S.Ct. 905 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). But this doctrine is not without exceptions. First, an agency’s interpretation of its regulation is not entitled to deference when the regulation is unambiguous. See, e.g., Christensen v. Harris Cty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (“Auer deference is warranted only when the language of the regulation is ambiguous.... To defer to [an] agency’s position [where the text is clear] would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.”); Duncan v. Muzyn, 833 F.3d 567, 581-82 (6th Cir. 2016). Second, agencies are not entitled to Auer deference when the regulation merely restates statutory text. Gonzales v. Oregon, 546 U.S. 243, 256-57, 126 S.Ct. 904, 163 L.Ed.2d 748 *487 (2006). Third, “deference is likewise unwarranted when there is reason to suspect that the agency’s interpretation ‘does not reflect the agency’s fair and considered judgment on the matter in question.’ ” Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012) (quoting Auer, 519 U.S. at 462, 117 S.Ct. 905). As the Supreme Court has recently explained:
This might occur when the agency’s interpretation conflicts with a prior interpretation, see, e.g., Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 [114 S.Ct. 2381, 129 L.Ed.2d 405] (1994), or when it appears that the interpretation is nothing more than a “convenient litigating position,” Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 213 [109 S.Ct. 468, 102 L.Ed.2d 493] (1988), or a “ ‘post hoc rationalization]’ advanced by an agency seeking to defend past agency action against attack,” Auer, supra, at 462 [117 S.Ct. 905] (quoting Bowen, supra, at 212 [109 S.Ct. 468]; alteration in original).
Id. at 2166-67.
I would decline to grant the Secretary’s position Auer deference under the third exception,[3] because the Secretary’s arguments during this litigation prove that his interpretation of § 435.1010(b) “is nothing more than a ‘convenient litigating position.’ ” Id. (quoting Bowen, 488 U.S. at 213, 109 S.Ct. 468). In his briefing before us, the Secretary argues that the critical ingredient in determining whether a person is an inmate under § 435.1010(b) is whether that person is voluntarily residing in a public institution. As an example of someone who would not be considered an inmate, the Secretary argued that “a child in the State’s custody who is temporarily placed in a public institution until a foster family home can be arrangedf ] ... is not considered an inmate” under § 435.1010(b). (Respondent’s Br. at 17.)
However, as Ohio correctly argues, the hypothetical child in the Secretary’s example is not “voluntarily” residing in a public institution; because the child is in the State’s custody, she would not be free to leave the public institution at her own volition. More broadly, because unemanci-pated minors are always in the custody of their parents, their guardians, or the State, it is difficult to imagine how a child could ever be “voluntarily” residing by themselves in a public institution. The Secretary’s interpretation of the regulation is-thus internally inconsistent—he is willing to provide federal Medicaid funds for some children who are involuntarily in state custody (children who have been removed from their, homes pending foster placement), but not others (juvenile pretrial detainees). This internal inconsistency counsels strongly against giving the Secretary’s interpretation Auer deference, because it demonstrates that the Secretary lacks a consistent and reasoned position as to which persons are subject to the inmate exclusion provision. See, e.g., Barboza v. Cal. Ass’n of Prof'l Firefighters, 799 F.3d 1257, 1268 (9th Cir. 2015) (holding that agency’s “internally inconsistent” interpretations lacked “the ‘hallmarks of thorough consideration’ ” and declining to afford either Auer or Skidmore deference (citation omitted)); Int’l Alliance of Theatrical & Stage Emps. v. N.L.R.B., 334 F.3d 27, 34 (D.C. Cir. 2003) (declining to provide Chevron deference to agency’s internally incon *488 sistent interpretation); Air Line Pilots Ass’n v. F.A.A., 3 F.3d 449, 453 (D.C. Cir. 1993) (declining to give Chevron deference to agency interpretation that was “internally inconsistent and therefore unreasonable and impermissible”); Trevino-Casares v. U.S. Parole Comm’n, 992 F.2d 1068, 1073 (10th Cir. 1993) (same); Sacramento Regional Cty. Sanitation Dist. v. Reilly, 905 F.2d 1262, 1271. n.18 (9th Cir. 1990) (same).
The majority glosses over the inconsistency in the Secretary’s position by pointing out that the Secretary has no “statutory duty to promulgate regulations that; either by default rule or by speculation, address every conceivable question in the process of determining equitable reim-bursemént” to the states, Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 96, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995), and by arguing that “[cjhildren in state custody for foster care purposes are excluded from the definition of “inmate[s] not because their stay is deemed voluntary, but because they do not reside in ‘public institutions.’ ” Maj. Op. at 479 (footnote omitted). Neither of these arguments are convincing. The majority’s first point is a stfew man; Ohio has never argued that the Secretary was required to promulgate separate regulations addressing the inmate status of children and adults. Rather, Ohio argues that juvenile pretrial detainees are not inmates under the text and logic of §. 435.1010(b). And the majority’s second point is flatly contradicted by the Secretary’s own briefing. See Respondent’s Br. at 17 (“An example [of a non-inmate] is a child in the State’s custody who is temporarily placed in a public institution until a foster family home can be arranged[.]” (emphasis added)).
The majority further argues that the Secretary’s voluntariness interpretation should receive Auer deference because CMS made reference to this interpretation in a 1997 memorandum, supposedly demonstrating that the interpretation was not contrived solely for this litigation. Maj. ,Op. at 479-80. However, the majority’s argument ignores the central problem with the Secretary’s interpretation: the Secretary has admitted .in this litigation that he will not always consider the voluntariness of a person’s stay in a public institution in determining whether she is an “inmate.” Specifically, the Secretary acknowledges that a child involuntarily in state custody pending foster placement is not an inmate of a public institution. See Respondent’s Br. at 17 (citing'Admin, R. at 84-85). The Secretary does not explain why, as' a matter of law, voluntariness matters for juvenile pretrial detainees, but does hot matter for juveniles awaiting foster placement—likely because there is no good faith' way to reconcile those positions if voluntariness is actually thé key criterion in determining whether a juvenile is an inmate of a public institution. It 'simply does not matter that CMS may have referenced this voluntariness requirement in a twenty-year-old memorandum; the Secretary’s admissions in this litigation show that he will not consistently apply the voluntariness interpretation going forward, undermining any rationale for giving the interpretation Auer deference.
Finally, the majority asserts that the Secretary’s voluntariness interpretation is implicitly supported by other language in § 435.1010. Maj. Op. at 478-79. The Secretary. never made this argument in his briefing, and thus the majority runs afoul of the Supreme Court’s admonition that we “may not supply a reasoned basis for the agency’s action that the agency itself has not given[.]” Bowman Transp., Inc. v. Ark-Best Freight Sys., Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Our task’is to assess whether deference to the Secretary’s position is warrant *489 ed; this necessarily places, the focus, of our inquiry on the reasoning advanced by the Secretary, and not whatever after-the-fact arguments we may be able to come up with. See S.E.C. v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (“The ground upon which an administrative order must be judged are those upon which the record discloses that its action was based[.]”). And the Secretary’s briefing makes clear that its voluntariness requirement was not grounded in the Medicaid Act or the text of § 435.1010(b), but rather in its own past interpretations of this provision. See, e.g., Respondent’s Br. at 14, 16.
Accordingly, I would decline to grant administrative deference of any sort to the Secretary’s self-serving, internally inconsistent interpretation of § 435.1010. We should not give the Secretary’s interpretation the force of law when it is clear.that the Secretary does, not intend to consistently apply that interpretation in all matters before his agency.
II, Interpreting § 435.1010
Because I believe that the Secretary’s interpretation of § 435.1010(b) is not entitled to Chevron or Auer deference, I would interpret the regulation de novo. See, e.g., Trevino-Casares, 992 F.2d at 1073 (observing, after declining to afford Chevron deference, “we consider it proper, indeed our duty, to follow our own independent interpretation of the statutes that govern the controversy before us”); see also Arizona v. Thompson, 281 F.3d 248, 254 (D.C. Cir. 2002) (reviewing statutes de novo after determining that Chevron deference was inappropriate).
As the majority explains, § 435.1010(b)’s text is ambiguous. Maj. Op. at 477-78. When a regulation is ambiguous, we look to the underlying statute’s legislative history, the regulation’s policy implications, and the regulation’s preamble in determining how best to interpret it. See In re Koenig Sporting Goods, Inc., 203 F.3d 986, 988-89 (6th Cir. 2000) (“When a statute is ambiguous, we look to its purpose and may consider the statute’s policy implications in determining what Congress intended.”); City of Las Vegas v. F.A.A., 570 F.3d 1109; 1117 (9th Cir. 2009) (“When a regulation is ambiguous, we consult the preamble of the final rule as evidence of the context or intent of the agency promulgating the regulations.”); see also Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc., 190 F.3d 729, 738-39 (6th Cir. 1999).
The legislative history for 42 U.S.C. § 1396d does not disclose the. policy reasons behind the inmate exclusion provision, and merely notes without discussion that a “State plan may not include any individual who is an inmate of a public institution, except as a patient in a medical institution.” See S. Rep. 89-404, 1965 U.S.C.C.A.N. 1943, 2022 (June 30, 1965). However, in 1985, the Health Care Financing Administration, CMS! predecessor agency, stated that the “intent of [the inmate exclusion] provision is to ensure that Medicaid funds are not used to finance care which traditionally has been the responsibility of State and local governments.” Medicaid Program; Federal Financial Participation for Inmates in: Public Institutions and Individuals in an Institution for Mental Disease or Tuberculosis, 50 Fed. Reg. 13196-01, 13196 (Apr. 3, 1985).
Ohio argues that providing Medicaid funds for juvenile pretrial detainees would comport with this policy, because under Ohio law, the juvenile’s parents, and not the state, typically pay for the juvenile’s care while in custody. See Ohio. Rev. Code § 2151.36 (“[W]hen a child has been committed as provided by this chapter ... the juvenile court shall issue an order ... requiring that the parent, guardian, - or person charged with the child’s support *490 pay for the care, support, maintenance, and education of the child.”); Matter of Mundy, No. CA97-10-027, 1998 WL 60502, at *1 (Ohio Ct. App. Jan. 26, 1998) (“When a child is in the temporary custody of an agency, the juvenile court may examine a parent’s income, order the parent to pay for certain expenses involved in the child’s commitment, including medical expenses, enter judgment, and enforce the same by execution.”); In re Rosser Children, No. 16911, 1995 WL 353720, at *4 (Ohio Ct. App. June 14, 1995) (same).
Ohio’s position is also supported by the only case to have examined the issue presented in this appeal, Brown v. County Commissioners of Carroll County, 338 Md. 286, 658 A.2d 255, 262-63 (1995). In Brown, a Maryland state pretrial detainee sought dental care during the first month of his incarceration, and was later billed by his jailers for the cost of the care. Id. at 291-92. The detainee argued that that he should not be liable for the dental payments, because under Maryland’s Medicaid program, the state health department was required to pay for all medical care incurred by “inmate[s] of a public institution ,., eligible for federally funded Medicaid benefits” in the first month of incarceration. Id. at 294. Maryland law tied the definition of the term “inmate of a public institution” to the federal definition adopted in 1978 by 42 C.F.R. § 435.1009, which is the same definition that exists today in 42 C.F.R. § 435.1010. Id. The pretrial detainee argued that he was not an “inmate of a public institution” because he was “in a public institution for a temporary period pending other arrangements appropriate to his needs.” Id. at 295. Relying on a 1990 opinion by then-Attorney General Dick Thornburgh, the State argued that pretrial detainees are not eligible for federal Medicaid benefits. Id.
The Maryland Supreme Court disagreed with the State and the Attorney General, holding that pretrial detainees are eligible for federal Medicaid benefits, and thus the plaintiff in that case was eligible for benefits under the identical provisions in Maryland’s Medicaid program. As the court explained:
We do not believe that the Attorney General’s and the County’s interpretations of federal law as excluding medical assistance coverage for pretrial detainees follows a common sense approach to the language of the applicable statutes. First, the language of the federal regulation does not appear to clearly exclude pretrial detainees from coverage. The County, relying on the Attorney General’s advisory opinion, argues first that the federal Medicaid regulations, by prohibiting coverage for “inmates of public institutions,” exclude coverage for pretrial detainees and that because § 15-113 of the Health-General Article follows the federal definition, it too excludes pretrial detainees. We note that in his advisory opinion, the Attorney General provides no federal authority to support his contention that 42 C.F.R. § 435.1009, which authorizes coverage for an inmate who is “in a public institution for a temporary period pending other arrangements appropriate to his needs” is not applicable to pretrial detainees. See 75 Op. Att’y Gen. at 1103. The Attorney General states only that, under Maryland law, there is nothing “inappropriate” about detaining those who cannot make bail. We find this argument unpersuasive. The language of 42 C.F.R. § 435.1009 does not require that an inmate’s temporary stay in a public institution be inappropriate; it requires only that the stay is temporary pending other appropriate arrangements. In the instant case, Brown was in jail because he was not able to post bond. He was therefore incarcerated for a temporary period until he was either able to post bond or until the disposition *491 of the criminal charges against him. The disposition of the criminal charges would determine which of two arrangements would be appropriate to his needs. He would either need to be punished by a specific sentence of incarceration or need to be released because incarcerartion is not necessary or he is not guilty of the criminal charges. Thus, Brown appears to clearly fall within 42 C.F.R. § 435.1009(b)’s exclusion and is “in a public institution for a temporary period pending other arrangements appropriate to his needs.”
We have found no authority to support the Attorney General’s contention that Medicaid coverage for an inmate “in a public institution for a temporary period pending other arrangements appropriate to his needs” is not intended to be applicable to pretrial detainees. We find it unlikely that the federal regulation would intend that those who are indigent and eligible for Medicaid loould lose those benefits simply because they are unable to post bail pending the disposition of the criminal charges against them.
Id. at 300-02 (emphasis added; footnote omitted).
Against this backdrop, I would hold that juvenile pre-trial detainees are eligible for federal Medicaid funds under § 435.1010(b) for two reasons.
First, this result best comports with the regulation’s plain language. As Ohio argues, juvenile pretrial detainees are, in a literal sense, persons living “in a public institution for a temporary period pending other arrangements appropriate to [their] needs.” 42 C.F.R. § 435.1010(b). Pretrial detention facilities are certainly public institutions, because they are administered by the state. Moreover, under Ohio law, “[o]ne of the overriding purposes of [the] juvenile justice system is the rehabilitation of offenders.” State v. Bloomer, 122 Ohio St.3d 200, 909 N.E.2d 1254, 1266 (2009); see also Ohio Rev. Code § 2151.01 (stating that the purpose of the juvenile justice system is to “provide for the care, protection, and mental and physical development of children subject to Chapter 2151 of the Revised Code, whenever possible, in a family environment, separating the child from the child’s parents only when necessary for the child’s welfare or in the interests of public safety.”). “Since its origin, the juvenile justice system has emphasized individual assessment, the best interest of the child, treatment, and rehabilitation, with a goal of reintegrating juveniles back into society.” State v. Hanning, 89 Ohio St.3d 86, 728 N.E.2d 1059, 1061 (2000). Accordingly, juvenile pretrial detainees are temporarily in custody pending other arrangements appropriate to their needs—once their hearing date comes up, Ohio’s juvenile justice system will determine how best to rehabilitate the affected juveniles.
Second, denying federal Medicaid benefits to juvenile pretrial detainees would not accord with the purpose of § 435.1010(b). As CMS’ predecessor agency explained, the purpose of the inmate exclusion provision was to prevent the federal government from paying for care traditionally assumed by the states. 50 Fed. Reg. at 13196. As Ohio accurately points out, however, the state does not traditionally pay for a juvenile’s care during pretrial detention. Rather, those costs are typically born by the juvenile’s parents. Ohio. Rev. Code § 2151.36. Accordingly, denying federal benefits to juvenile pretrial detainees would not advance the regulation’s admitted purpose.
Moreover, I find the Maryland Supreme Court’s reasoning particularly compelling in this context. If CMS’ interpretation of § 435.1010(b) is correct, children eligible for Medicaid would lose their benefits during their pretrial detention period regardless of whether they are ultimately found *492 guilty of a crime. Because Ohio generally requires the child’s parents to pay for the child’s care, losing federal Medicaid benefits would be a particularly severe blow for the -parents of juvenile pretrial detainees; they will be required to pay the full cost of their children’s medical care during detention even though the children are otherwise eligible for Medicaid. One study has estimated.the health care costs for persons incarcerated in Ohio at up to $6,755 per year. See The. Pew Charitable Trusts, State Prison Health Care Spending: An Examination 24 (2014), http://www. pewtrusts,org/=/media/assets/2014/07/ stateprisonhealthcarespendingreport.pdf. The blow visited by these health care costs will fall predominantly on families taking advantage of the federal “Healthy Start” program, which provides Medicaid funds for uninsured children in families with a total income of up to 206% of the federal poverty level.[4] See Ohio Department of Medicaid, Programs for Children, Families, and Pregnant Women,' http:// medicaid.ohio.gov/FOROHIOANS/ Programs/ChildrenFamiliesandWomen. aspx (last visited July 7, 2017). The harsh result reached by the majority would thus seem to cut against the véry purpose of the Medicaid program, which is'to ease the burden of medical expenses on children and the needy. See Schweiker, 457 U.S. at 571, 102 S.Ct. 2597 (“The Medicaid program was established ... ‘for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons.’ ” (citation omitted)). In the absence of any compelling textual or policy reasons to reach such a result, the plain language interpretation of the regulation should control.
III. Conclusion
The'language and purpose § 435.1010(b) make clear that juvenile pretrial detainees are not inmates of a public institution, and are thus eligible for federal Medicaid funds. The Secretary’s contrary interpretation should not be afforded administrative deference because it is internally inconsistent, signaling that the Secretary will not apply a considered and consistent rationale in determining which persons are subject to the Medicaid Act’s inmate exclusion provision. Furthermore, the Secretary’s position is contrary to the Medcaid Act’s remedial purpose of easing the burden of medical expenses for needy children and families. I would therefore grant the petition for review, and require the Secretary to grant Ohio’s Medicaid plan amendment.

‘. Although I characterize § 435.1010(b) as an interpretive regulation, it is nevertheless subject to principles of. administrative deference because it "directly governs the conduct” of states like Ohio, "affecting [their] rights and obligations.” See Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 172, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007) (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)).

. Rather, if an agency wishes- to depart from an interpretation it has taken in prior published regulations, it may do so by employing the same notice-and-comment rulemaking procedure it used to promulgate the regulations in the first place, subject to the constraints imposed by the Administrative Procedure Act. See S. Forest Watch, Inc. v. Jewell, 817 F.3d 965, 976 (6th Cir. 2016); Nat’l Cable & Telecommc'ns Ass’n v. F.C.C., 567 F.3d 659, 667 (D.C. Cir. 2009).

.- Section 435.1010(b) is ambiguous enough to require interpretation because "it is capable of being understood by reasonably well-informed persons in two or more senses.” Qwest Corp. v. Colo. Pub. Util. Comm'n, 656 F.3d 1093, 1099 (10th Cir. 2011) (quoting Thomas v. Metro. Life Ins. Co., 631 F.3d 1153, 1161 (10th Cir. 2011)); Sec’y of Labor v. Beverly Healthcare-Hillview, 541 F.3d 193, 198 (3d Cir. 2008); see also Maj. Op. at 477-78.

. As of January 26, 2017, 206% of the federal poverty level for a family of four is $50,676. See Office of the Assistant Secretary for Planning and Evaluation, U.S, Department of Health and Human Services, U.S, Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs (Jan. 26, 2017), https://aspe.hhs.gov/poverty-■guidelines.